IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DARREL RUNDUS and | § | |
| GREAT NEWS NETWORK, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | 3:06-CV-1032-P |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| and JANET NAPOLITANO, | § | |
| SECRETARY U.S. DEPARTMENT | § | |
| OF HOMELAND SECURITY, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

On September 1, 2009, the above captioned case was brought to trial before this Court. Over the course of the next three days the parties presented witnesses, evidence, and arguments. The bench trial ended on September 3, 2009. On November 2, 2009, each party filed a post-trial brief. After careful consideration of the evidence, the applicable law, and the parties' arguments, the Court issues this Memorandum Opinion and Order memorializing the Court's findings of fact and conclusions of law.

### I. FINDINGS OF FACT

A. The Parties

1. Plaintiffs are Darrel Rundus, II, ("Mr. Rundus") and Great News Network, Inc. ("GNN") (collectively "Plaintiffs"). Rundus is the founder and president of Great News Network, Inc. GNN is a Christian organization, with thousands of members around the world, that seeks to help people of the Christian faith find ways to share their religious belief with others.

2. Defendants are the United States of America and Janet Napolitano in her capacity as the current Secretary of the United States Department of Homeland Security (collectively "Defendants").

B. <u>The Million Dollar Bill</u>

1. Among Plaintiffs' religious beliefs is the belief that they should share their faith with others. In accordance with this belief, Plaintiffs not only share their faith with others, but also teach others ways to effectively share their faith.

2. Plaintiffs often use "Gospel tracts" to aid them in sharing their faith.

3. A "Gospel tract," as Plaintiffs use the term, is a condensed version of the Gospel[1] from the Bible, put on to a pamphlet, leaflet, or similar medium that can be given out to people that Plaintiffs come into contact with.

4. Plaintiffs utilize Gospel tracts by giving the Gospel tracts to people with whom Plaintiffs come into contact. Using Gospel tracts serves the dual purpose of providing people with a written copy of their message and as a means of starting a verbal conversation in which they can share their faith.

5. Plaintiffs have used many different types of Gospel tracts as a means of sharing their faith with others.

6. The "Million Dollar Bill" is the most popular and effective Gospel tract used by Plaintiffs.

7. The Million Dollar Bill is a Gospel tract that asks the million dollar question, "will you go to heaven?" The question, printed on the back of the tract, is followed by a quick test and excerpts from the Bible.

8. The Million Dollar Bill is designed to look like U.S. currency at first glance, but not designed to fool anyone into believing that it is real U.S. currency.

9. While U.S. currency that is currently printed by the U.S. Treasury contains security features designed to prevent and detect counterfeit, the Million Dollar Bill does not have any of these features.

10. Currently, the United States Treasury prints U.S. currency in the following denominations: $1, $5, $10, $20, $50, and $100.

11. The United States Treasury has never made currency in the denomination of $1,000,000.

12. The Million Dollar Bill is the same width as a genuine U.S. currency, but is one-eighth of an inch longer than genuine U.S. currency.

---

[1] The Court uses the term Gospel in this Order solely as Plaintiffs use the term. But in no way should the Court's findings be taken as a factual finding as to what the term Gospel means to others.

13.  The Million Dollar Bill – like the genuine 2006 Series $20 Federal Reserve Note – is green and black with subtle background colors of green, peach, and blue.

14. The Million Dollar Bill feels thicker and smoother than genuine currency.

15. With the exception of the color, the Million Dollar Bill at issue in this case, appears as follows:



16. The front of the Million Dollar Bill has an over-sized picture of President Grover Cleveland.  The only similarity between the picture of President Cleveland on the Million Dollar Bill and the picture of President Andrew Jackson on the 2006 Series Federal Reserve Note is that they are both over sized, and slightly left of center.  While President Cleveland appeared on the

1934C Series $1000 Federal Reserve Note, the pictures are different and the picture on the $1000 Federal Reserve Note is not oversized. Federal Reserve Notes are no longer printed in the denomination of $1000.

17. The top of genuine U.S. currency has the numeric value of the bill printed on both the left and right sides, with "FEDERAL RESERVE NOTE" printed somewhere in between the two depending on the particular denomination and series.

18. The top of the Million Dollar Bill has the number 1,000,000 printed on the left and right sides. Next to the printed number on the top right, it states, "RESERVED NOTE."

19. "THIS NOTE IS LEGAL TENDER FOR ALL DEBTS, PUBLIC AND PRIVATE" is printed on the lower left portion of genuine U.S. currency. Below that is a signature, with the words "Treasurer of the United States" underneath it. This can be seen in the picture displayed below ¶ 21.

20. "THIS NOTE IS NOT LEGAL TENDER FOR ALL DEBTS, PUBLIC AND PRIVATE" is printed on the lower left portion of the Million Dollar Bill. Below that is a signature, with the words "Department of Eternal Affairs" underneath it.

21. As pictured below, to the left of the portrait of President Jackson on the 2006 Series $20 Federal Reserve Note is the Federal Reserve seal, in the border of the seal it states "UNITED STATES FEDERAL RESERVE SYSTEM." Behind the seal, in the background is a picture of an eagle.



22. To the left of the portrait of President Cleveland on the Million Dollar Bill is a different seal that has a similar border, except the words contained within its border are "UNITED STATES OF AMERICA RESERVED FEDERAL SYSTEM." Behind the seal, in the background is a picture of a bird – the picture of the bird on the Million Dollar Bill is different from the picture of the bird on the 2006 Series $20 Federal Reserve Note.

23. As pictured below, to the right of the portrait of President Jackson on the 2006 Series $20 Federal Reserve Note is the Treasury seal, in the border of the seal it states, "THE DEPARTMENT OF THE TREASURY 1789."



24. To the right of the portrait of President Cleveland on the Million Dollar Bill is the Treasury seal, in the border of the seal it states, "THOU SHALT NOT STEAL ISAIAH FIFTY FIVE ONE."

25. As pictured below, the 2006 Series $20 Federal Reserve Note features a small gold bird holding a triangular shield just to the right of President Jackson's left shoulder. To the right of, and slightly below the bird there is a signature with the caption "Secretary of the Treasury," as pictured below.



26. The Million Dollar Bill features a small gold bird just to the right of President Cleveland's left shoulder. Only the wings and head of the bird are visible because the rest of its body is hidden by a rectangular shield. Next to the bird is a signature with the caption "Secretary of the Treasure" below it.

27. The back of the Million Dollar Bill features typed writing along the borders. As stated above, this writing asks the million dollar question, followed by a quick test and excerpts from the Bible. Also typed on the back, is a statement indicating that it is distributed by GNN with a link to www.thegreatnews.com.

28. Due to the typed writing outlining the back of the Million Dollar Bill, the statement indicating it is distributed by GNN, and the link to GNN's website, the back of the Million Dollar Bill bears no real resemblance of genuine U.S. currency. Accordingly, the Court need not make any factual findings comparing the back of the Million Dollar Bill to genuine U.S. currency.

29. Living Waters produces and distributes the Million Dollar Bill. Though Plaintiffs once worked with the Living Waters organization, both organizations were independent of each other.

30. Plaintiffs have never participated in the production of the Million Dollar Bill.

31. The Million Dollar Bill was brought to the attention of the Secret Service by a bank in North Carolina. It is unclear exactly why the bank brought it to the Secret Service's attention. However, it was not brought to the attention of the Secret Service as a result of an individual trying to pass it as legal tender.

32. There is no evidence that any individual has ever accepted the Million Dollar Bill as legal tender for any debts, public or private, or tried to use as legal tender for any debts, public or private.

33. There is no evidence that the Million Dollar Bill has ever been used as a template for making counterfeit currency. Nor is there any evidence that anyone has ever attempted to alter the Million Dollar Bill to make counterfeit currency.

34. There is no reasonable risk that an unsuspecting, reasonable, and prudent person would accept the Million Dollar Bill as genuine U.S. currency.

C. The Secret Service's Trip to Great New Network's Office

1. In June 2006:

    a. Paul Ahner ("Agent Ahner") was the Secret Service Dallas Field Office Duty Agent.

    b. David Robey ("Agent Robey") was a Special Agent with the United States Secret Service in the Wilmington, North Carolina Resident Office.

    c. Roy Whatley, Jr., ("Agent Whatley") was a Special Agent with the United States Secret Service assigned to the Dallas Field Office and was the Resident Agent in Charge of the investigation of GNN.

    d. Erin Erdman ("Agent Erdman") was a Special Agent with the United States Secret Service assigned to the Dallas Field Office.

    e. Mickey Kennedy ("Agent Kennedy") was a Special Agent with the United States Secret Service assigned to the Dallas Field Office.

    f. Billy Jack Flowers ("Agent Flowers") was the Assistant Special Agent in Charge of the United States Secret Service Dallas Field Office.

    g. Mark Lowrey ("Agent Lowrey") was s Special Agent in Charge of the Dallas District with the United States Secret Service.

    h. Agent Desmond Pascoe was a Special Agent with the United States Secret Service assigned to the Dallas Field Office.

    i.   Mr. Rundus was the President of GNN.

    j.   Timothy Crawford ("Mr. Crawford") was the Evangelism Boot Camp Director for GNN.

    k.   Jon Speed ("Mr. Speed") was the Director of Local Leader Development for GNN.

2. On June 1, 2006, Agent Ahner received a call from Agent Robey. Agent Robey indicated that a million dollar novelty note was taken to Citizens Bank in Fayetteville, North Carolina. Agent Robey informed Agent Ahner that the novelty note had GNN's web address printed on it and that his research revealed that GNN was located in Denton, Texas.

3. On June 2, 2006, Agent Whatley was assigned Special Agent in Charge of the investigation into the novelty note and GNN's connection to it. The same day, Agent Whatley along with Agents Eridman and Kennedy went to GNN's office located at 2012 W. University Drive, Denton, Texas.

4. When Agents Whatley, Eridman, and Kennedy arrived at GNN they presented their credentials to the secretary in the reception area. The secretary then informed Mr. Crawford that Secret Service agents were in the office. Mr. Crawford then proceeded to the front where he greeted the agents. The agents identified themselves and informed Mr. Crawford that they were there to investigate a million dollar note. Mr. Crawford then invited the agents back to his office. While walking back to his office, Mr. Crawford was informed by one of the agents that they intended on confiscating the Million Dollar Bills.

5. In Mr. Crawford's office, Agent Whatley handed Mr. Crawford a photo-copied page from a book that contained 18 U.S.C. §§ 475-478 in full, and portions of 18 U.S.C. §§ 474 & 479. After handing this to Mr. Crawford, further discussion ensued concerning the Million Dollar Bill. During this conversation, Mr. Crawford produced a Million Dollar Bill for the agents.

6. Agent Whatley made clear to Mr. Crawford that they believed the Million Dollar Bill was in violation of federal law. He also made clear to Mr. Crawford that he did not believe that GNN or any of its employees was trying to deceive anyone with the Million Dollar Bill.

7. The agents pressed Mr. Crawford to give them any and all Million Dollar Bills that were at GNN's office. Mr. Crawford told the agents that he would have to call his boss, Mr. Rundus, because Mr. Rundus was the only one with the authority to give the agents the Million Dollar Bills. None of the agents objected to Mr. Crawford calling Mr. Rundus.

8. Mr. Rundus was in fact the only one who possessed the authority to consent to a search of GNN's office or the seizure of the Million Dollar Bills.

9. Mr. Crawford called Mr. Rundus and explained the situation to him. Mr. Rundus then asked to speak with one of the agents. Agent Whatley then agreed to speak to Mr. Rundus on the phone. During that conversation, Agent Whatley stated that the Million Dollar Bills "are contraband. We need to take them."

10. Mr. Rundus asked Agent Whatley if they had a warrant or court order to take the Million Dollar Bills. Agent Whatley then admitted that they did not have a court order or a warrant. Mr. Rundus then informed Agent Whatley that he believed he and GNN had a right to due process, and that the Agents were not to take the Million Dollar Bills.

11. Before getting off the phone, Mr. Rundus told Agent Whatley that if he returned with a search warrant or a court order to take the Million Dollar Bills that he would turn over the Million Dollar Bills.

12. Agent Whatley then handed the phone back to Mr. Crawford. Mr. Rundus then told Mr. Crawford "They [the agents] are not going to take the bills. They are going to go." A few moments later the phone conversation ended.

13. While Agent Whatley and Mr. Crawford were on the phone with Mr. Rundus, Agent Kennedy made at least one phone call. Agent Kennedy gave Mr. Crawford the impression that he was on the phone with United States Secret Service authorities in Washington D.C.

14. Agent Kennedy was not in fact on the phone with anyone in Washington D.C.

15. Shortly after Agent Kennedy had concluded his call(s) and the call with Mr. Rundus ended, Agent Whatley and Agent Kennedy briefly conferred with each other by the door of Mr. Crawford's office. The agents then returned to the area near Mr. Crawford's desk.

16. At this point, Agents Whatley, Kennedy, and Erdman had been told that Mr. Rundus was the only person with the authority to consent to the Million Dollar Bills being taken, and they knew that Mr. Rundus would not give his consent unless there was a warrant or court order.

17. With all three agents present, Agent Kennedy told Mr. Crawford that they did not need a warrant, the Million Dollar Bills were contraband and that the agents needed to take the "contraband" with them, or destroy the "contraband" before leaving.

18. Mr. Crawford protested, asking, "What about due process? What about a warrant." Agent Kennedy responded that the Million Dollar Bills are "contraband. We have seen it. It doesn't matter. Either way the contraband is coming with us."

19. Mr. Crawford, then asked if there was any other option.

20. In response, Agent Kennedy informed Mr. Crawford that the agents would be leaving GNN's office with the bills, or Mr. Crawford and the bills. Agent Kennedy's response was intended to have the effect of making Mr. Crawford believe that he could either give the agents the Million Dollar Bills, or the agents would arrest him and take the Million Dollar Bills.

21. Agents Whatley and Erdman remained silent.

22. Mr. Crawford continued to protest and inquire about other options.

23. Agent Kennedy remained adamant that the Million Dollar Bills were leaving the office with the agents, and the only decision Mr. Crawford needed to make is whether the agents were going to have to take him with the Million Dollar Bills as well. Agent Kennedy continued to press, telling Mr. Crawford that the agents would give him a receipt for the Million Dollar Bills, and that he could get them back depending on the results of an investigation.

24. Mr. Crawford, based solely on his sincere belief that he would be arrested if he did not give the agents the Million Dollar Bills, gave into Agent Kennedy's demands and agreed to retrieve all of the Million Dollar Bills.

25. Mr. Crawford walked to Mr. Speed's office and explained to him that the agents were taking the Million Dollar Bills, or arresting him [Mr. Crawford] and taking the Million Dollar Bills.

26. For the first time since the agents entered the office, Mr. Crawford took them to a closed closet door. Mr. Crawford then opened the door and revealed 83 packs of the Million Dollar Bills. Each pack contained 100 Million Dollar Bills. The agents seized all 83 packs. Additionally, Agent Whatley retrieved a few Million Dollar Bills that Mr. Crawford was carrying in his shirt pocket.

27. Agent Whatley issued Mr. Crawford a receipt for the 83 packs of Million Dollar Bills.

28. The Million Dollar Bills seized from GNN's Office on June 2, 2006 remain in possession of the United States Secret Service.

29. As the agents were leaving with all of the Million Dollar Bills, someone at GNN's office mentioned the possibility of alerting the media.

30. One of the agents then informed Agent Pascoe that the Million Dollar Bills had been seized. At that time, Agent Pascoe was also informed that there was a possibility the media may be alerted about the agents seizure of the Million Dollar Bills. Thereafter, Agent Pascoe called Agent Flowers and relayed this information to him.

31. Agent Flowers then contacted the Counterfeit Division of the United States Secret Service. This was the first time that anyone from the Dallas Field Office had contacted the Counterfeit Division in relation to the Million Dollar Bills at GNN's office.

32. Agent Flowers then contacted Agent Lowry to inform him that Agents Whatley, Kennedy, and Erdman had seized the Million Dollar Bills and to alert him to the possibility of media attention.

33. Beginning the night of June 2, 2006, there was media attention concerning the seizure of the Million Dollar Bills

34. In June 2006, it was not United States Secret Service protocol to require special agents to write a report after every investigation they participated in. Agents Kennedy and Erdman were however, asked to prepare memorandum detailing the events of their visit to GNN's office. This request was made after the media began covering the seizure of the Million Dollar Bills from GNN's office.

35. In preparing their individual memorandums on June 6, 2006, Agents Kennedy and Erdman conspired together to cover up the actual events that took place at GNN's office on June 2, 2006. On September 3, 2009, Agents Kennedy and Erdman persisted in covering up these events by being untruthful when they took the witness stand during the bench trial for this case.

36. On June 12, 2006, Plaintiffs filed a complaint seeking a preliminary injunction to have the Million Dollar Bills taken on June 2, 2006 returned to their possession and seeking a declaration that the Million Dollar Bills did not violate any laws.

37. Also on June 12, 2006, Agent Lowery sent a letter to Mr. Rundus. The letter indicated that the Million Dollar Bill violated 18 U.S.C. §§ 474 and 475. The letter further stated that there are standards Mr. Rundus must follow to use the Million Dollar Bill as a religious tract. The letter then it refered Mr. Rundus to 18 U.S.C. section 504 and to the "Know Your Money" link found at www.secretservice.gov.

II.     **CONCLUSIONS OF LAW**

A. **Because the Million Dollar Bill Does Not Pose Any Reasonable Risk of Fraud, Nor does it Pose a Risk of Facilitating Would-be Counterfeiters it does Not Violate 18 USC § § 474 or 475.**

a.   <u>The applicability of 18 U.S.C. § § 474 and 475.</u>

Section 474 makes it a felony to – among other things – possess with intent to sell, or otherwise use "any obligation or other security made or executed, in whole or in part, after the similitude of any obligation or other security issued under the authority of the United States . . . . or [to] print . . . any engraving, photograph, print, or impression in the likeness of any such obligation or other security, or any part thereof . . .." 18 U.S.C.A. § 474 (West Supp. 2009). Similarly, section 475 proscribes the making or use of advertisements and certain other documents "in the likeness or similitude of any obligation or security of the United States issued under or authorized by any Act of Congress." 18 U.S.C.A. § 475 (West Supp. 2006).

Plaintiffs argue that because Congress has never authorized or issued a million dollar bill that the Million Dollar Bill falls under the ambit of section 514, not sections 474 or 475. In support of their position, Plaintiffs argue that the plain language of the statute – i.e. the phrase any "obligation or security of the United States" – coupled with the enactment of section 514, criminalizing fictitious obligations, demonstrates that sections 474 and 475 do not apply to non-existent denominations.

Section 514 makes it a felony to create, with an intent to defraud, "any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States . . . ." 18 U.S.C.A. § 514 (West 2000). The legislative history of

section 514 "suggests that the statute was intended to close a perceived loophole in the

counterfeiting laws." *United States v. Summa*, No. 02 Cr. 101 (GEL), 2003 U.S. Dist. LEXIS

10860, at *4 (S.D.N.Y. June 25, 2003). "Senator D'Amato, who introduced the bill, apparently

understood then-existing counterfeiting statutes to prohibit the uttering only of unauthorized

versions of genuine banknotes or securities, but not of instruments that purported to be valid

examples of entirely made-up or non-existent securities." *Id.* Based primarily on the legislative

history, the Ninth Circuit "interpret[ed] the phrase 'false or fictitious instrument' in section 514

to refer to non-existent instruments" and included within this definition $100 million and $500

million federal reserve notes.[2] *United States v. Howick*, 263 F.3d 1056, 1067 (9th Cir. 2001).

Nothing about the enactment of section 514, however, convinces this Court that sections

474 and 475 are inapplicable to the case at bar. For starters, "[t]he Federal Criminal Code is

replete with provisions that criminalize overlapping conduct." *Pasquantino v. United States*, 544

U.S. 349, 359 (2005). As such, "[t]he mere fact that two federal criminal statutes criminalize

similar conduct says little about the scope of either." *Id.* Moreover, the legislative history

provided by Plaintiffs, which also forms the basis of the *Howick* court's decision, is vague and

provides few details on the alleged pre-section 514 loophole in the counterfeiting laws. While

Senator D'Amato's introductory statement does briefly mention a concern with fictitious "U.S.

dollar notes," this passing reference certainly does not prove the existence of an overriding

congressional concern with non-existent denominations, nor does it show the existence of a

---

[2] Other courts have applied § 514 in situations involving federal reserve notes in non-existent denominations. *See Summa*, 2003 U.S. Dist. LEXIS 10860, at *1–8 (rejecting a vagueness challenge to 18 U.S.C. § 514 where the defendant was convicted under the statute after seeking to deposit purported $100 million federal reserve notes in a brokerage account); *United States v. Shabbar*, 20 Fed. Appx. 394, 395 (6th Cir. 2001) (upholding conviction under 18 U.S.C. § 514 for possession of alleged federal reserve notes in the amount of $100 million and $500 million).

loophole regarding such notes.[3]  Having found that 18 U.S.C. sections 474 and 475 can be applied to non-existent denominations, the Court proceeds to examine whether the Million Dollar Bill violates sections 474 and 475.

        b.  The Million Dollar Bill is Not in the Likeness or Similitude of U.S. Currency

Plaintiffs' possession and distribution of the Million Dollar Bill violates sections 474 and 475 if the Million Dollar Bill is found to be in the likeness or similitude "of any obligation or other security issued under the authority of the United States . . . or any part thereof."  18 U.S.C. § 474; *see also* 18 U.S.C. § 475.

The traditional test for "similitude" is "whether the item is such that it would deceive an honest, sensible and unsuspecting person of ordinary care that the item was genuine currency." *Wagner*, 412 F. Supp. at 430; *see also Howick*, 263 F.3d at 1067 (articulating a nearly identical standard for "similitude" in the context of 18 U.S.C. § 472); *Boggs v. Bowron*, 842 F. Supp. 542, 561 (D.D.C. 1993); *United States v. Parr*, 716 F.2d 796, 807 (11th Cir. 1983).  The test for "likeness" under paragraph seven of section 474 is not well defined.  *See, e.g., Boggs v. Bowron*, 842 F. Supp. at 561 (stating simply that it is a part of the traditional "similitude" test); *Wagner*, 412 F. Supp. at 430 (noting that it is not as stringent as the test for "similitude").  The "or any part thereof" language of the statute does indicate, however, that the statute intends to include

---

[3]  Senator D'Amato's introductory statement included the following remarks:
    This legislation combats the use of fictitious financial instruments to defraud individual investors, banks, pension funds, and charities. These fictitious instruments have been called many names, including prime bank notes, prime bank derivatives, prime bank guarantees, Japanese yen bonds, Indonesian promissory notes, U.S. Treasury warrants, and U.S. dollar notes. . . .
    Because these fictitious instruments are not counterfeits of any existing negotiable instrument, Federal prosecutors have determined that the manufacture, possession, or utterance of these instruments does not violate the counterfeit or bank fraud provisions contained in chapters 25 and 65 of title 18 of the United States Code.
141 Cong. Rec. S 9533 (1995) (statement of Sen. D'Amato).

conduct that substantially replicates U.S. currency without replicating it in whole. Indeed, Courts have stated that the provision evinces a congressional purpose "to tolerate no manipulation in the making of impressions of government obligations or securities, whether the copies or impressions might be good or bad, and regardless of the purpose for which they might be made. . . ." *Koran v. United States*, 408 F.2d 1321, 1325 (5th Cir. 1969) (citing *Webb v. United States*, 216 F.2d 151, 152 (6th Cir. 1954)).

For example, a print will fall under the statute's coverage if part of it is in the likeness of an obligation or other security issued under the authority of the United States, even if other parts that would indicate its genuineness to a person trained in identifying counterfeiting could easily distinguish it as counterfeit. Section 474 and 475 would still cover this type of conduct because these statutes do not serve the purpose of protecting the trained eye from the ills of counterfeiting. Rather, sections 474 and 475 serve the purpose of protecting an honest, sensible and unsuspecting person of ordinary care from being deceived by counterfeit currency.

Though the alleged counterfeit item need not replicate U.S. currency in whole, the alleged counterfeit item will only violate the statutes when taken as a whole it poses a reasonable risk of deceiving an honest, sensible, and unsuspecting person. Put another way, even when parts of an item mimic U.S. currency that item will not violate the statute if the dissemination of the item poses no reasonable risk of deceiving an honest, sensible, and unsuspecting person. The easiest way to illustrate the application of this rule is with the facts of this case.

The Government went to great lengths during the trial to demonstrate the difficulty of distinguishing the Million Dollar Bill and genuine U.S currency when viewed from a distance. Plaintiffs did not dispute that the Million Dollar Bill looked like real money from a distance. There is also no question that a number of aspects of the Million Dollar Bill duplicate aspects of

real currency.  In fact, Plaintiffs explicitly stated that the ability to deceive from a distance, and

the resemblance of the Million Dollar Bill to genuine U.S. currency are the reasons it is their

most successful tool in spreading their word to others.

Despite these similarities, the Million Dollar Bill, taken as a whole poses no reasonable

risk of deceiving an honest, sensible, and unsuspecting person.  There are a number of things

which lead to this conclusion.  First and foremost, is the fact that the Million Dollar Bill purports

to be worth a million dollars.  There is no genuine currency in this amount.  More importantly,

the amount the bill purports to be worth would lead any unsuspecting, honest, and reasonable

person to become suspicious of the bills genuineness.  Though many people would readily accept

a one-hundred dollar bill without thinking there was a need to even give the bill a cursory

examination, a reasonable and honest person would suspect that a bill purporting to be worth a

million dollars is not genuine.[2]  This suspicion would lead the honest and reasonable person to

do more than merely glance at the bill from a distance.  The Million Dollar Bill feels like an

index card or construction paper, not genuine U.S. currency.  Based on the feel of it alone, a

reasonable and honest person would likely determine that it is fake.  Even if the feel did not lead

such a person to immediately determine the Million Dollar Bill is not genuine U.S. currency it

would not take more than a cursory look at it to know that it was fake.  There are countless

aspects of the Million Dollar Bill that demonstrate it is not genuine currency, including, but not

limited to (1) the printed writing on the back, (2) the statement on the back that it is distributed

---

[2] During the trial, counsel for the Government continuously asked witnesses to look at the Million Dollar Bill at a
distance.  The idea being that if an individual was not holding the Million Dollar Bill or looking at it from a very
close distance, and the individual did not know that there was no such thing as a genuine million dollar bill, then it
may be difficult for that individual to determine if it was genuine.  The problem with the Governments argument is
that it is impossible to believe that any *reasonable* person would accept a bill purporting to be worth a million
dollars under the circumstances counsel for the Government tried to create in the courtroom.  Any person that would
accept a bill purporting to be worth a million dollars without holding it or at least looking at it from closer than five-
feet away is not a reasonable person.  Rather, such a person would epitomize the unreasonable person.

by GNN, (3) the printed website on the back, (4) the words "Thou Shalt Not Steal Isaiah Fifty

Five One" surrounding the seal on the front, (5) the statement on the front indicating that it is

from the Department of Eternal Affairs, and (6) the bills explicit statement that it is not legal

tender.

It is therefore clear, that the Million Dollar Bill does not pose a reasonable risk of

deceiving an honest, sensible, and unsuspecting person.

> c.   The Color and Size Requirements of 18 U.S.C. § 504 are Inapplicable to
>      Plaintiffs

The Government however, argues that even if the unaltered Million Dollar Bill does not

pose a reasonable risk of harm, a would be counterfeiter could alter it to deceive an honest,

sensible, and unsuspecting person. Defendants base this argument on the Million Dollar Bill's

failure to comply with the size and color requirements of section 504.

Section 504 allows for the "printing, publishing, or importation . . . of illustrations of . . .

any . . . obligation or other security of the United States . . .." provided that certain requirements

are met. 18 U.S.C. § 504. The first requirement, known as the color requirement, provides that

"all illustrations [must] be in black and white." *Id.* The second requirement, commonly referred

to as the size requirement, provides that "all illustrations . . . shall be of a size less than three-

fourths or more than one and one-half, in linear dimension, of [the currency] illustrated." *Id.*

The third and final requirement – which is rarely if ever referred to – requires that "the negatives

and plates used in making the illustrations shall be destroyed after their final use in accordance

with this section." *Id.*

The requirements of section 504 were discussed at length by the Supreme Court in *Regan*

*v. Time*, 468 U.S. 641 (1984). There, Sports Illustrated – (owned by Time) – had printed a

picture of $100 bills going through a basket ball hoop on the cover of its magazine. *Time*, 468

U.S. at 646.   After being warned by the Secret Service that this picture violated the requirements

of section 504, Time filed suit seeking declaratory judgment that the requirements of section 504

were unconstitutional. *Id.* at 647.

The *Time* Court noted that the requirements of section 504 "were not limited to . . .

prevent[ing] would-be counterfeiters from utilizing the illustration itself." *Id.* at 656-57.   Rather,

the requirements are also meant to prevent the tools utilized in making the illustrations from

falling into the hands of would-be counterfeiters. *Id.*   Accordingly, the statute served the

compelling government interest of preventing the negatives Time used to print the Sports

Illustrated cover from falling into the hands of would-be counterfeiters.

Here, the Government makes a similar argument.   The Government argues that even if

the Million Dollar Bill itself poses no reasonable risk of deceiving an honest, reasonable, and

unsuspecting person that in the wrong hands it could be easily altered to create a product that

would deceive such a person.

The Court however, finds the Government's argument to be misplaced.   It is misplaced

because the Government does not argue that the Plaintiffs are violating the statute through

possessing the tools to make the Million Dollar Bill.   Instead, the Government argues that

Plaintiffs possession and distribution of the finished product poses a risk of facilitating would be

counterfeiters.   This argument would be similar to saying that retailers who sold the Sports

Illustrated at issue in *Time* were in violation of the statute even though the illustration on the

actual cover did not pose a risk of deceiving an honest, reasonable, and unsuspecting person.

More importantly, this argument fails because there has been no evidence to indicate that

there is a reasonable risk that a would-be counterfeiter has used, or would in the future use the

Million Dollar Bill as a template for making counterfeit currency. Not only has there been no evidence, the idea that the Million Dollar Bill would be used for such a purpose in this day in age defies logic. It seems far more likely, especially in light of technological advances, that a would-be counterfeiter would use actual U.S. currency as a template for reproducing counterfeit currency. At best, a would-be counterfeiter is more likely to try and obtain the tools used by Living Waters to create counterfeit money than they are to use the finished product possessed and distributed by Plaintiffs. But Living Waters is not a party to this case, and therefore the Government's argument that the Million Dollar Bill's risk of being altered by a would-be counterfeiter warrants a finding that it violates section 504 holds no 'water.'

For these reasons, the Court holds that Plaintiffs' possession and distribution of the Million Dollar Bill does not violate sections 474 or 475, and the requirements of section 504 are inapplicable. Accordingly, the Court need not address Plaintiffs' arguments that these sections violate the First Amendment of the United States Constitution. The Court does however, address Plaintiffs' argument that secret service agents violated the Fourth Amendment by seizing the Million Dollar Bills without a warrant.

### B. Secret Service Agents Violated the Fourth Amendment By Seizing the Million Dollar Bills From GNN's Office Without a Warrant or Valid Consent

The Fourth Amendment guarantees people the right to be free from unreasonable searches or seizures. U.S. Const. Amend. IV. Searches conducted pursuant to a valid warrant and within the scope of that warrant are presumptively reasonable. A warrantless search or seizure however, is presumptively unreasonable and violates the Fourth Amendment unless it falls within one of the exceptions to the warrant requirement. *See Brigham City, Utah v. Stuart,* 547 U.S. 398, 403 (2006) (stating that "because the ultimate touchstone of the Fourth

Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions"); *see also United States v. Robinson*, 414 U.S. 218, 235 (holding that a search incident to arrest is reasonable and therefore does not violate the Fourth Amendment); *see also United States v. Ruigomez*, 702 F.2d 61, 64 (5th Cir. 1983) (stating "[i]t is well settled that a search conducted pursuant to consent is excepted from requirements of probable cause and warrant") (*quoting United States v. Baldwin*, 644 F.2d 381, 383 (5th Cir. 1981)).   Defendants argue that the consent exception applies to the warrantless search and seizure conducted by Agents Whatley, Kennedy, and Erdman at GNN's office on June 2, 2006.

The consent exception to the requirement applies when: (1) it is given by an individual possessing authority to give consent, or that law enforcement officers reasonably believe to possess authority to give consent; and (2) it is given voluntarily. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (*citing Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990)).   Failure to obtain consent from a person that law enforcement officers reasonably believe to possess common authority, or failure to obtain such consent voluntarily, makes the consent exception inapplicable.

### 1.   Mr. Crawford Did Not Possess Authority to Consent to a Search or Seizure.

An individual possessing common authority over property has the authority to give consent in the absence of the occupant with whom common authority is shared. *Skally v. United States*, 347 U.S. 935 (1954) (holding "that where two persons have equal rights to the use or occupation of premises, either may give consent to a search . . ..")   The term "'common authority' is not synonymous with a technical property interest." *Randolph*, 547 U.S. at 110.   "[R]ather [the term rests] on mutual use of the property by persons generally having joint access or control for most purposes, so that it reasonable to recognize that any of the co-inhabitants has the right to permit [law enforcement] inspection." *United States v. Matlock*, 415 U.S. 164, 171, n.7 (1974).

When a person's common authority is "readily apparent" law enforcement officers may rely on that persons consent without a need to confirm that the person actually possess common authority. *Randolph*, 547 U.S. at 111. For example, "[w]hen someone comes to the door of a domestic dwelling with a baby at her hip . . . she shows that she belongs there, and that fact standing alone is enough to tell a law enforcement officer . . . she probably . . . [has] common authority." *Randolph*, 547 U.S. at 112. Similarly, law enforcement officers cannot rely on consent given by an occupant that obviously does not share common authority over the property. *See id.* (noting that "even a person clearly belonging on premises as an occupant may lack any perceived authority to consent"). A young child for example, may have authority to let guests into the entrance of a home and even some common areas of the home, but no one could reasonably believe that the child has the authority to allow law enforcement officers to search the closets and drawers within the home. *Id.* And of course, law enforcement officers cannot rely on consent that is given by an occupant who has vehemently and repeatedly stated that they do not possess the authority to give consent.

Here, Mr. Crawford did just that, he told Agents Whatley, Kennedy, and Erdman that only Mr. Rundus had the authority to consent to their seizure of GNN's Million Dollar Bills. Agent Whatley then invited Mr. Rundus into the discussion when he spoke to him on the phone. Mr. Rundus reiterated that he was the only one with the authority to give consent and then made it quite clear that at no point would they receive his consent. But Mr. Rundus was not unreasonable. In fact, Mr. Rundus informed Agent Whatley that he would turn the Million Dollar Bills over without a problem, *if* the agents obtained a warrant or court order. To put it another way, Mr. Rundus simply requested that Agents Whatley, Kennedy, and Erdman respect the rights given by the Fourth Amendment of the United States Constitution.

Apparently, this request was not one with which the agents were willing to comply. Instead of taking the time to obtain a warrant the agents focused their efforts on obtaining the consent of a person who they all knew did not have the authority to give consent. Based on this factor alone, the agents violated the Fourth Amendment. Unfortunately, the agents unconstitutional conduct was not limited to obtaining consent from a person they knew did not have the authority to give it, as the invalid consent they received from Mr. Crawford was not given voluntarily.

### 2. Agent Kennedy Coerced Mr. Crawford into Giving Consent

Consent that is given as "the result of duress or coercion, express or implied" is not voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). "For, no matter how subtly the coercion [is] applied, the resulting 'consent' [is nothing] more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id.*

Agent Kennedy was not subtle in the manner by which he implied that he was taking the Million Dollar Bills with him no matter what – even if it meant arresting Mr. Crawford in the process. The facts and circumstances surrounding Agent Kennedy's statements to Mr. Crawford on June 2, 2006, leave no doubt that Mr. Crawford believed he would be arrested if he did not retrieve the Million Dollar Bills from the closed closet in which they were hidden out of the agents' sight. Agent Kennedy's coercive tactics not only resulted in an unconstitutional search and seizure, it also resulted in bringing disrepute to the noble profession of law enforcement.

III.   **CONCLUSION**

For the reasons stated above, the Court declares

1.  The Million Dollar Bill does not violate 18 U.S.C. §§ 474 or 475, and therefore the requirements of section 504 are inapplicable;
2.  Plaintiffs' claims which seek a declaration that §§ 474, 475, and 504 violate the First Amendment of the Constitution are moot;

3.  Agents Whately, Kennedy, and Erdman violated the Fourth Amendment when they failed to obtain proper consent to search for, and subsequently seize the Million Dollar Bills from GNN's office.

It is therefore ORDERED that Defendants immediately return all of the Million Dollar

Bills seized from GNN's office on June 2, 2006.

**IT IS SO ORDERED.**

Signed this 30th day of ~~February~~ March, 2010.

_Jorge A. Solis_
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE